UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RUTH E. NUNEZ,

                    Plaintiff,

          -against-

ANDREW SAUL, COMMISSIONER OF
SOCIAL SECUIRTY,[1]

                  Defendant.
-------------------------------------------------------x

                            **MEMORANDUM AND ORDER**
                                17-CV-1769 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Ruth E. Nunez ("Nunez"), proceeding *pro se*, brings this action against

defendant, the Commissioner of the Social Security Administration ("SSA"), seeking review,

pursuant to 42 U.S.C. § 405(g), of the Commissioner's determination that she is not entitled to

Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. The

Commissioner now moves for judgment on the pleadings pursuant to Federal Rule of Civil

Procedure ("Rule") 12(c), which Nunez opposes. (Def. Mem. (Doc. No. 17); Pl. Opp'n (Doc.

No. 22).) For the reasons set forth below, the Commissioner's motion is denied, and the case is

remanded to the Commissioner for further proceedings.

## BACKGROUND

### I.    Nunez's Early Life, Education, and Work History

      Nunez was born on July 1, 1985, in the Dominican Republic. (Admin. R. at 65, 290.)

When she was four years old, her mother abandoned her for a period of approximately three

years – an episode which she claims continues to cause her stress as an adult. (*Id.* at 353, 357.)

---

[1] During the pendency of this case, the Senate confirmed Andrew Saul to the post of Commissioner, replacing Acting Commissioner Nancy Berryhill. Pursuant to Federal Rule of Civil Procedure 25(d), Saul is hereby substituted as the defendant.

Nunez attended school through ninth grade. (*Id.* at 175.) At some point during her childhood, she immigrated to the United States.

Nunez worked intermittently between 2001 and 2003, when she was a teenager; she subsequently resumed full-time employment in 2005; and thereafter she worked more or less consistently until she was laid off from her last job in December 2011. (*Id.* at 72, 174–75, 193–201, 235, 374.) Her work during this time included "picking," "ticketing clothes," and "packing/stock," (*id.* at 193) – in other words, she worked as a store clerk and as a warehouse or factory employee responsible for packing and labeling merchandise. (*Id.* at 72, 175, 193–201, 235.) She has not worked since December 2011.

## II.    Nunez's Relevant Pre-Application History

In late 2011 or early 2012, around the same time she stopped working, Nunez became pregnant with her daughter. (*Id.* at 265, 345–47.) During the course of her pregnancy, she sought and received treatment for prenatal health issues at Plaza Del Sol Health Center ("Plaza Del Sol") in Queens, New York. (*Id.* at 300–47.) Although she was seen by a number or healthcare professionals at Plaza Del Sol, her primary provider was Catherine Trossello, a nurse practitioner. (*See id.* at 177, 271, 383.) Nunez's treatment at Plaza Del Sol focused on ensuring proper nutrition and quelling bouts of nausea and vomiting. (*See id.* at 304–05; 313–14; 321–24; 331–32.) At appointments in January and June of 2012, however, she complained of "recurrent migra[i]ne episodes for most of her life," for which a physician's assistant prescribed her

Imitrex[2] and Naproxen[3] and referred her for a neurology evaluation. (*Id.* at 311, 344.) And at appointments in January and April of 2012, she reported feeling anxiety "all her life" and "all the time," for which she received a referral to "social services." (*Id.* at 325, 346.) She did not otherwise indicate psychological issues during her pregnancy, and in fact, during several appointments, she explicitly denied feelings of depression. (*Id.* at 341–42, 345.)

The administrative record does not appear to include records from any social services referral during this time, and the records evidencing Nunez's neurology referral are sparse. The first such record is a brain MRI report from Elmhurst Hospital Center ("Elmhurst Hospital") dated July 31, 2012. (*Id.* at 264.) As interpreted by Dr. David Weeks, the MRI revealed cerebellar tonsillar ectopia – a malpositioning of a part of the brain responsible for motor control which can either be asymptomatic or cause a range of serious symptoms, including severe headaches. (*Id.* at 264.)[4] The MRI was "otherwise unremarkable." (*Id.*)

The second record is an appointment note from a follow-up with the Elmhurst Hospital neurology department dated September 2012. In the note, a doctor or nurse – whose name is illegibly written – reviewed the MRI and noted that it did not reveal hydrocephalus, or the buildup of fluid in brain cavities. (*Id.* at 265.) A different doctor or nurse – whose name is also

---

[2] Imitrex "is used to treat acute migraine headaches in adults." *Sumatriptan (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/sumatriptan-oral-route/description/drg-20074356 (last visited Feb. 11, 2019).

[3] "Naproxen is a nonsteroidal anti-inflammatory drug (NSAID)." *Naproxen (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/naproxen-oral-route/description/drg-20069820 (last visited Feb. 12, 2019).

[4] "Cerebellar tonsillar ectopia denotes an inferior location of the cerebellar tonsils below the margins of the foramen magnum. It, therefore, encompasses both minor asymptomatic tonsilar ectopia and Chiari I malformations." Francis Fortin & Frank Gaillard, et al., *Cerebellar Tonsillar Ectopia*, RADIOPAEDIA, https://radiopaedia.org/articles/cerebellar-tonsillar-ectopia?lang=us (last visited Feb. 11, 2019). Type 1 Chiari malformations, in turn, occur "when part of your skull is abnormally small or misshapen, pressing on your brain and forcing it downward." *Chiari Malformation*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/chiari-malformation/symptoms-causes/syc-20354010 (last visited Feb. 11, 2019). "Headaches, often severe, are the classic symptom of Chiari malformation." *Id.*

illegible – met with Nunez. Nunez again reported experiencing chronic migraines "since she was a little girl," and she described them as causing her to become sensitive to light and sound. (*Id.*) She also complained of depression and anxiety. (*Id.*) The second doctor or nurse "[r]ecommend[ed] neurology for chronic significant migraines." (*Id.*) The record does not indicate what treatment, if any, came of this recommendation.

Nunez's daughter was born on October 4, 2012. (*Id.* at 269.) In a postpartum depression screening at Plaza Del Sol conducted several weeks later, Nunez denied feeling disinterested, depressed, or hopeless within the previous two weeks, and she denied feeling depressed or sad "most day[s]" within the previous two years. (*Id.* at 294.) In a subsequent appointment with Trossello in June 2013, however, she reported that her psychological problems had returned. Specifically, she complained of anxiety, associated overeating, depression, and daily headaches "that [I]mitrex only helps sometimes." (*Id.* at 284.) She added that she "used to see neurology in Elmhurst," that she had previously seen a psychiatrist and a therapist on 102nd street (in Queens), and that she "would like to return to their services." (*Id.* at 284.) The administrative record contains no records from any such psychiatrist or therapist. Trosello diagnosed Nunez with, as relevant, "[m]ood disorder" and "[h]eadache"; she referred Nunez for psychiatry and neurology treatment; and she prescribed an additional medication, Topiramate,[5] for the headaches. (*Id.* at 285.)

In the summer of 2013, Nunez began to attend appointments as the Western Queens Consultation Center ("WQCC"), where she would receive therapy and psychiatric services up through the date of her ALJ hearing in 2016. On August 1, 2013, WQCC social worker Michelle

---

[5] "Topiramate is used alone or together with other medicines to help treat certain types of seizures." *Topiramate (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/topiramate-oral-route/description/drg-20067047 (last visited Feb. 12, 2019).

Silva prepared Nunez's initial treatment plan. (*Id.* at 367–68.) This document listed Nunez's diagnoses as "MDD" (major depressive disorder)[6], "ADHD" (attention-deficit/hyperactivity disorder)[7], and "[s]evere [m]igraines." (*Id.* at 367.) It also noted her current Global Assessment of Functioning ("GAF") score was 55. (*Id.*)[8] The plan established short-term and long-term treatment goals for improvement in Nunez's depression and ADHD. These included, for example, improving confidence and reducing feelings of hopelessness to no more than once per week. (Admin. R. at 367.) The treatment itself, meanwhile, included medication management and weekly therapy. (*Id.*) The target date for meeting the long-term goals was February 2014. (*Id.* at 368.)

During the same August 1, 2013, appointment at WQCC, Nunez met with psychiatrist Usha Tandon, who prescribed Escitalopram, a drug for treating depression and anxiety. (*Id.* at 366.)[9] The medication chart produced by WQCC indicates that Nunez saw Dr. Tandon seven

---

[6] MDD "is a mood disorder that causes a persistent feeling of sadness and loss of interest. . . . [I]t affects how you feel, think and behave and can lead to a variety of emotional and physical problems [and] . . . trouble doing normal day-to-day activities . . . ." *Depression (Major Depressive Disorder)*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/depression/symptoms-causes/syc-20356007 (last visited Feb. 12, 2019).

[7] ADHD "is a mental health disorder that includes a combination of persistent problems, such as difficulty sustaining attention, hyperactivity and impulsive behavior. Adult ADHD can lead to unstable relationships, poor work or school performance, low self-esteem, and other problems." *Attention-Deficit/Hyperactivity Disorder (ADHD)*, MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/adult-adhd/symptoms-causes/syc-20350878 (last visited Feb. 12, 2019).

[8] The GAF is designed to "measure symptom severity or psychological, social, and occupational functioning during a specified period, on a continuum from mental health (score 100) to mental illness (score 0)." Liza H. Gold, *DSM-5 and the Assessment of Functioning: The World Health Organization Disability Assessment Schedule 2.0 (WHODAS 2.0)*, 42 J. AM. ACAD. PSYCHIATRY L. 173, 173–74 (2014). A GAF score of 55 signifies "moderate difficulty in social, occupational, or school functioning."[8] The GAF is no longer the American Psychiatric Association's ("APA") preferred measure of general functioning; it was not included in the most recent edition of the APA's Diagnostic and Statistical Manual of Mental Disorders ("DSM-5") "for several reasons, including its conceptual lack of clarity . . . and questionable psychometrics in routine practice." AM. PSYCH. ASS'N, DSM-5 16 (2013).

[9] "Escitalopram is used to treat depression and generalized anxiety disorder (GAD). It is an antidepressant that belongs to a group of medicines known as selective serotonin reuptake inhibitors (SSRIs)." *Escitalopram (Oral*

more times between August 2013 and February 2014. At the third appointment, in September

2013, Dr. Tandon switched Nunez's prescription to Prozac and Risperdal, which she then

continued to prescribe through February 2014, where the chart ends. (*Id.*) Prozac is used to

treat, among other things, depression and panic disorder.[10] Risperdal is an antipsychotic that, as

relevant, may be paired with an antidepressant for treatment of MDD and psychosis.[11] In their

fifth appointment, in November, Dr. Tandon added a prescription for Cogentin, which can be

used to treat reactions to other medications.[12] The administrative record does not include

treatment notes from any of these appointments with Dr. Tandon – notes which may have

explained why Dr. Tandon prescribed Risperdal and Cogentin.

The record also does not include notes from the therapy appointments with Silva that

Nunez said she attended during this time. (*See id.* at 374.) The next available document is a

treatment plan review dated November 1, 2013, parts of which are illegible or barely legible.

(*Id.* at 474–75.) The review, signed by both Silva and Dr. Tandon, indicates that Nunez

"continues to display symptoms of major depression and anxiety," and that the "[d]ischarge

criteria have not yet been met." (*Id.* at 475.)

III.    **Nunez's DIB Application and Subsequent Medical History**

On January 21, 2014, Nunez filed for DIB, alleging disability beginning on December 24,

2011, due to "mood disorder," "ADHD," and "severe migraines." (*Id.* at 17, 65–66.) While

---

*Route*), MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/escitalopram-oral-route/description/drg-20063707 (last visited Feb. 12, 2019).

[10] *See Fluoxetine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/fluoxetine-oral-route/description/drg-20063952 (last visited Feb. 12, 2019). Prozac is a brand name for Fluoxetine.

[11] *See Risperidone (Risperdal)*, NAT'L ALL. ON MENTAL ILLNESS, https://www.nami.org/Learn-More/Treatment/Mental-Health-Medications/Risperidone-(Risperdal)-en (last updated Aug. 2018).

[12] *See Benztropine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/benztropine-oral-route/description/drg-20072652 (last visited Feb. 12, 2019).

Nunez's DIB application was pending, WQCC continued to develop its assessment of Nunez's mental health. On January 27, 2014, Silva conducted a mental status examination. (*Id.* at 364.) The examination revealed appropriate mannerism and cooperative attitude, rational and coherent thought processes, fair memory, and normal affect. (*Id.* at 364.) It also revealed, however, anxiety, distractibility, poor concentration, poor intellectual functioning, lethargic and hopeless mood, impaired judgment, and paranoid thinking. (*Id.*) During the exam, Nunez endorsed having experienced both auditory and visual hallucinations. (*Id.*)

On what appears to be the same day, Silva also completed an assessment form, which features more details about the exam and Silva's impression of Nunez's mental health status. According to the form, Nunez's primary complaints were "excessive hopelessness, restlessness, difficulty concentrating, and irritability," and she found "it difficult to keep a job due to severe migraines and difficulty concentrating." (*Id.* at 352.) Nunez reported that she had attended psychotherapy within the five previous years – she could not remember dates or other details – and had been hospitalized due to migraines "on several occasions." (*Id.* at 353, 356.) She denied having a history of either substance abuse or sexual abuse. (*Id.* at 355, 357.)

Relying on the foregoing, Silva altered Nunez's MDD diagnosis to "MDD w[ith] [p]sychotic features," *i.e.*, the paranoia and hallucinations; added a diagnosis for "GAD" (generalized anxiety disorder); and gave Nunez a new GAF score of 41, indicating "serious impairment in social [or] occupational . . . functioning." (*Id.* at 362, 364.)[13] Silva explained that Risperdal had been prescribed to treat Nunez's paranoia and hallucinations. (*Id.* at 365.) She also opined that these conditions manifested in occupational problems, social problems, and

---

[13] *See Global Assessment of Functioning (GAF) Scale*, UNIV. AT ALBANY, *supra* note 6.

difficulty in self-care, adding that Nunez "has difficulty carrying out routine activities." (*Id.* at 361.)

Two days later, on January 29, Nunez returned to Plaza Del Sol "requesting thyroid eval as requested by psych provider," and explaining "her counselor thinks she could have a thyroid imbalance." (*Id.* at 271.) Trossello examined Nunez and "reviewed and reconciled" Nunez's medication list, which omitted mention of her prescriptions of Risperdal, Prozac, and Cogentin. (*Id.*) Trosello repeated her June 2013 diagnoses of mood disorder and headache, and she added a diagnosis for ADD. (*Id.* at 271, 285.) Trossello also ordered thyroid tests, and she advised Nunez to continue Naproxen for her headaches and "continue with neuro" for her ADD. (*Id.*) The administrative record does not appear to include the test results, nor does it indicate that Nunez underwent any "neuro" treatment around this time.

On February 1, WQCC completed a second treatment plan review. (*Id.* at 472–73.) The review noted that Nunez's discharge criteria still had not been met, and that Nunez "continue[d] to display symptoms of major depression and anxiety." (*Id.* at 473.) Like the first review, it was signed by both Silva and Dr. Tandon, and parts of it are illegible. (*Id.* at 472–73.)

On February 27, 2014, Nunez, her daughter, and an unidentified social worker went to the SSA field office, where Nunez was interviewed about her DIB claim. (*Id.* at 170–79.) At the interview, Nunez discussed her work history and the treatment of her impairments. Asked to identify providers who might have relevant medical records, she listed Plaza Del Sol and WQCC. (*Id.* at 177–78.)

After the interview, pursuant to the information supplied by Nunez, the field office requested medical records Plaza Del Sol, WQCC, and Elmhurst Hospital. (*Id.* at 67–68.) The office also requested records from a neurologist, Dr. Teresella Gondolo, but it is not evident from

interview notes or other contemporaneous records how Dr. Gondolo entered the picture. (*Id.* at 68, 201, 370–71.) Finally, the office requested a consultative examination of Nunez, and it mailed Nunez two forms, a Function Report and a Work History Report, for her to complete and return. (*Id.* at 180.) In the cover letter mailed with the forms, the office explained that it was "responsible for obtaining information in connection with" Nunez's application. (*Id.* at 180.)

On March 21, 2014, Nunez completed the forms. On the Function Report, she described her migraines and headaches as severely painful, occurring once or twice per week on average, persisting for one or two days at a time, and attended by vomiting and sensitivity to light and sound. (*Id.* at 189–90.) She stated that she received treatment at Elmhurst Hospital and Flushing Hospital approximately a year and half earlier, which would have been around the time of her daughter's birth at the end of 2012. (*Id.* at 189.)

On April 1, 2014, disability examiner S. Choi entered a note in Nunez's file to the effect that there was "no record found in [F]lushing hosp[ital]" and that, although Elmhurst did have records of treating Nunez, it had "no 2013 and 2014 records for migraine ER visits cl[aimant] mentioned." (*Id.* at 202.) Choi did not mention whether the field office sought or received records from 2012, when Nunez reported visiting the hospital. Instead, the next day, he called Nunez to request that she clarify the details of her treatment, but Nunez was again unable to identify an exact date or treatment location. (*Id.*)

On April 11, Nunez underwent the SSA's requested consultative examination, conducted by Dr. Nadine Gardner, Psy.D. (*Id.* at 374–78.) At the examination, Nunez described her migraines and depression. For migraines, she reported receiving treatment from "Dr. Trocello, the neurologist" – presumably a reference to Catherine Trossello, who is a registered nurse. (*See id.* at 271, 374.) For depression, she stated that she saw Silva weekly for therapy and Dr. Tandon

9

monthly for psychiatric services.  (*Id.*)  She did not mention Dr. Gondolo.  Based on her

examination, Dr. Gardner stated that Nunez had fair insight and judgment, "poor memory," and

"[i]ntellectual functioning appear[ing] to be within the borderline range" – in other words, nearly

intellectually disabled.  (*Id.* at 376.)  Dr. Gardner diagnosed Nunez with, as relevant,

"[p]ersistent depressive disorder," "[p]anic disorder," "[r]ule out borderline IQ," and "[c]hronic

migraines."  (*Id.* at 377.)  She concluded that "[t]here is no impairment in [Nunez]'s ability to

understand and follow simple directions and instructions or perform simple tasks independently,"

however, "[t]here is [a] mild impairment in making appropriate decisions," and "a moderate

impairment in attention and concentration . . . [,] in maintaining a regular schedule . . . [,] in

learning new tasks [, and] in performing complex tasks independently."  (*Id.*)  Her prognosis was

fair.  (*Id.*)

On April 23, 2014, having received no response from Dr. Gondolo and, evidently, no

records of Nunez's claimed 2012 hospital visits, Choi denied Nunez's initial claim for DIB.  (*Id.*

at 65–73.)  Reviewing the record before him, Choi observed that "[t]here is no indication that

there is medical [opinion] or other opinion evidence" to obtain.  (*Id.* at 70.)  Reviewing Nunez's

submissions, in particular, he found Nunez to be "not credible."  (*Id.*)  He concluded that,

although she suffered from a severe medically determinable impairment in the form of her

depression, Nunez had only "moderate restrictions in [attention and concentration]" that would

not prevent her from working in a "low stress work setting."  (*Id.* at 69–72.)

On May 19, 2014, Nunez retained an attorney, Marc Strauss, and on May 22, she

requested a hearing on her DIB claim before an ALJ.  (*Id.* at 78–81.)  In a subsequently

completed disability report, Nunez identified three sources of medical information:  Plaza Del

Sol, WQCC, and Dr. Gondolo.  (*Id.* at 207–08.)  With respect to Dr. Gondolo, Nunez stated that

the doctor had been treating her headaches since 2012, and that the treatment included "examination, evaluation . . . follow up, [and] check up." (*Id.* at 207.) She also identified Dr. Gondolo's address, which is in Elmhurst, Queens. (*Id.*)

In a letter sent to Nunez in July, the SSA informed her, "We need to make sure that your file has everything you want the ALJ to consider and any other evidence the ALJ will need to decide your case." (*Id.* at 85–86.) The letter requested that Nunez submit any evidence as soon as possible, and it added, "If a physician, expert, or other person is not providing documents important to your case, you may ask the ALJ to issue a subpoena." (*Id.*)

Nunez's course of treatment over the next two years is difficult to glean from the administrative record. First, the record does not contain any documents from Dr. Gondolo. Second, around the end of 2014, Nunez briefly sought mental health treatment from a new provider, Catholic Charities Neighborhood Services, Inc. ("CCNS"). (*Id.* at 427–436.) The administrative record contains only intake and termination records from CCNS, and no evidence that Nunez actually received treatment there. As part of the intake, a social worker at CCNS conducted a mental status exam, which, unlike the mental status exams administered earlier in the year by Silva and Dr. Gardner, indicated "unimpaired" memory and "average" intellectual functioning. (*Id.* at 364, 376–77, 429.) Following the exam, the social worker diagnosed Nunez with anxiety "D/O NOS," and assigned a GAF score of 45 – similar to the 41 assigned by Silva after the January 2014 mental status exam, and reflecting "serious impairment in social [or] occupational . . . functioning." (*Id.* at 364, 438.) On a February 2, 2015, termination summary, CCNS noted that Nunez "changed her mind" and decided "to go back to her former clinic where she is currently receiving therapy." (*Id.* at 440–41.)

Third, around the same time she entertained transferring to CCNS, Nunez completed SSA forms describing her recent medical history and current medications. (*Id.* at 215.) On the forms, she described her impairment as "chronic migraines, debilitating anxiety and depression, [and] ADHD." (*Id.* at 237.) She listed Trossello, Dr. Gondolo, and a psychiatrist at CCNS as providers who had treated or examined her since May 23, 2014, the day after she filed her request for an ALJ hearing. (*Id.* at 237.) Specifically with respect to Dr. Gondolo, Nunez provided the doctor's address and stated that her last appointment was on August 2, 2014. (*Id.*) As for medication, she reported taking Prozac, Imitrex, Topiramate, Propranolol,[14] Clonazepam (Klonopin),[15] and Nuedexta.[16] (*Id.* at 237, 239.) According to Nunez, the Propranolol was prescribed to treat shaking and tremors, while each of the other drugs was prescribed to treat either her migraines or her anxiety, panic, and depression. (*Id.*)

Fourth, although Nunez evidently continued to receive treatment at WQCC throughout 2014 and into 2016, the record contains only five WQCC documents from this period. Four of them, which appear to cover dates between August 2014 and the summer of 2015, are illegible in varying degrees. (*Id.* at 447, 463–71.) As far as the Court can discern, they indicate continued treatment of Nunez's depression and psychotic symptoms, characterized by "uneven" progress. They also suggest that, sometime between August 2014 and February 2015, Lorena Fernandez

---

[14] Propranolol, as relevant, may be used to treat both migraine headaches and tremors. *See Propranolol (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/propranolol-oral-route/description/drg-20071164 (last visited Feb. 13, 2019).

[15] Clonazepam is, as relevant, used to treat panic disorder. *See Clonazepam (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/clonazepam-oral-route/description/drg-20072102 (last visited Feb. 13, 2019).

[16] Nuedexta "is used to treat a rare condition called pseudobulbar affect (PBA) or emotional incontinence. PBA is a nervous system disorder that is characterized by uncontrollable, sudden, and frequent episodes of crying or laughing." *Dextromethorphan and Quinidine (Oral Route)*, MAYO CLINIC, https://www.mayoclinic.org/drugs-supplements/dextromethorphan-and-quinidine-oral-route/description/drg-20074618 (last visited Feb. 13, 2019).

replaced Michelle Silva as Nunez's primary therapist. (*Id.* at 469, 471.) The fifth document covers the period between September 2015 and the ALJ hearing in May 2016. It is a letter from Wanda Arocho, a mental health counselor at WQCC, sent to the ALJ on the eve of the hearing. (*Id.* at 443.) In the letter, Arocho claimed to have been serving as Nunez's therapist since September 2015, and she stated that, during this time, Nunez continued to see a psychiatrist for medication management on a monthly basis. (*Id.*) She described Nunez's treatment goals as management of depression, "mood stabilization leading to . . . capacity for everyday functioning," replacing "psychotic processes with reality-focused processes," and improving capacity for self-care. (*Id.*) She noted that Nunez has "shown uneven progress" with meeting these goals. (*Id.*)

Fifth and last, during the same two-year period from 2014 to 2016, Nunez continued to sporadically seek treatment at Plaza Del Sol for medical issues, such as headache and dizziness (in April 2014) and episodes of shaking and shortness of breath (in May 2015). (*Id.* at 392–94, 409.) Sometime in 2014, it appears that Plaza Del Sol finally learned of Nunez's prescriptions for Prozac and Risperdal, (*id.* at 405–09), but it does not seem that Plaza Del Sol was otherwise involved in treatment of her psychological issues. At the May 2015 appointment, for example, Trossello advised Nunez to "follow up with neurology" and "[c]ontinue with psych treatment." (*Id.* at 393.)

## IV.    The Hearing Before the ALJ

The SSA assigned ALJ Jay L. Cohen (the "ALJ") to hear Nunez's appeal. On February 22, 2015, the ALJ sent letters to a medical expert, Dr. Sharon Grand, Ph.D. (the "ME"), and a vocational expert, Andrew Pasternak (the "VE"), requesting their testimony at the upcoming hearing. (*Id.* at 116–19) The letters each stated that "[c]opies of the pertinent exhibits . . .

tentatively selected for inclusion in the record of this case will be mailed under separate cover if not enclosed with this notice." (*Id.*) Both letters noted that documents were enclosed, but which documents those were is not revealed in the administrative record. (*Id.*) The administrative record also does not include any subsequent letters from the ALJ enclosing exhibits he received after February 22.

On February 25, 2016, the ALJ mailed Nunez a Notice of Hearing, which contained basic information about hearing procedures. (*Id.* at 99–103.) In particular, the letter informed Nunez that the ALJ "may issue a subpoena that requires a person to submit documents or testify at [the] hearing. [The ALJ] will do this if the person has evidence or information that you reasonably need to present your case fully." (*Id.* at 102.) It added that, if Nunez wanted the ALJ to issue a subpoena, she must write in with a request "no later than 5 days before [the] hearing." (*Id.*)

On March 3, 2016, the ALJ issued two subpoenas – one to Trossello at Plaza Del Sol, requesting "all documents" dating back to January 1, 2014, and one to WQCC, requesting "all documents" dating back to January 1, 2013. (*Id.* at 123–33.) He did not issue a subpoena to Dr. Gondolo or to any other provider. It is not evident what came of the subpoena to Plaza Del Sol. WQCC, however, did not respond until the day before the hearing, when it faxed 36 pages of records dating back to 2013 to Nunez's attorney, Strauss. (*Id.* at 40–44.) Among these records are the five largely illegible documents covering the two years of Nunez's therapy and psychiatric treatment leading up to the hearing. Also on the day before the hearing, Arocho sent her letter describing Nunez's progress in therapy to the ALJ. (*Id.* at 443.)

The hearing took place on May 5, 2016. The ALJ, Nunez, Strauss, and the ME were present in person throughout the hearing, while the VE was present by phone. (*Id.* at 37–64.) At the outset, Strauss informed the ALJ about WQCC's last-minute production. (*Id.* at 40–41.) The

ALJ at first hesitated, asking Strauss and the ME whether the documents were "important to have," and, when they both replied in the affirmative, whether they were "[v]ery important to have." (*Id.* at 41.) The ME replied that they were, and she added that, in fact, she was missing two other exhibits, identified as 9F and 10F. (*Id.* at 41–42.) 9F comprises all documents produced by CCNS from Nunez's brief treatment there, (*id.* at 427–42), and 10F is Arocho's letter, (*id.* at 443). The VE was not asked and did not volunteer whether he was also missing these exhibits.

Belatedly convinced of the importance of the WQCC production, the ALJ proposed adjourning the hearing for 30 minutes while Strauss arranged to fax the documents to the hearing office so that they could then be scanned into the record and given to the ME. (*Id.* at 42–43.) During this time, the ALJ would also print Arocho's letter and provide it to the ME. Strauss and the two experts agreed with this plan. (*Id.*) Before going on recess, the ALJ urged Strauss to act quickly, as the fax machine in the hearing office was "not good," and took "awhile" to receive documents. (*Id.*)

As far as the record reveals, the ALJ did not acknowledge or seek to rectify the omission of exhibit 9F from the ME's exhibits. The record also does not indicate how much time the ME had to review the WQCC production, whether the VE even received those documents, or whether the VE also did not possess copies of exhibits 9F and 10F. If any of these issues were discussed immediately after the recess, the hearing transcript would not reveal it, as this portion of the hearing was not transcribed. Instead, for reasons unknown, the transcript skips from the beginning of the recess to partway through the ALJ's examination of Nunez. (*Id.* at 44.)

In the portion of Nunez's testimony that was transcribed, she described suffering from migraines, depression, ADHD, and extreme stress. (*Id.* at 44–46; 49–53) She testified that she

sees Dr. Gondolo for her migraines at a clinic in Queens, and that Dr. Gondolo prescribes Imitrex and other medications. (*Id.* at 46–47.) She also confirmed that she had continued with her WQCC treatment schedule, seeing Dr. Tandon monthly and a therapist weekly. (*Id.* at 48.)

When it was the ME's turn to testify, she confirmed that she had reviewed all "mental health evidence of record." (*Id.* at 54–57.) She acknowledged that this evidence did not include any of the years of appointment notes presumably created by WQCC, but she maintained that the treatment plans were an adequate substitute. (*Id.* at 57–58.) Based on her review, the ME opined that Nunez had "major depressive disorder moderate, with psychotic features which include some paranoia . . . and some hallucinations[;] . . . generalized anxiety[;] and . . . a history of ADHD." (*Id.* at 58.) The ME added, "it looks like her current neurologist is also agreeing with [this] diagnosis. I don't see an evaluation but her neurologist also indicates that it's there." (*Id.* at 58.) It is not clear to what neurologist the ME was referring. Dr. Gondolo was Nunez's neurologist, but the SSA – and, presumably, the ME – had not received any records from her. After thus diagnosing Nunez, the ME opined that the foregoing impairments limited Nunez's functional capacity to work only to the extent that she would require simple and routine tasks in a low-stress environment with no more than occasional contact with the public. (*Id.* at 58–59.)

The VE testified next. Using the functional limitations offered by the ME, he testified that Nunez would be capable of performing her past work. (*Id.* at 61–62.)

## V.     The ALJ's Decision and the Five-Step Process

On May 27, 2016, the ALJ issued his written decision finding Nunez not disabled within the meaning of the Social Security Act. (*Id.* at 14–32.) In the decision, the ALJ followed the familiar five-step process for making disability determinations:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

16

[2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

[3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

[4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

[5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920(a)(4).

At step one, the ALJ found Nunez had not been engaged in substantial activity from her alleged onset date through her date last insured. (Admin. R. at 19.) At step two, he found Nunez had the following severe, medically determinable impairments: "migraines, moderate major depressive disorder with psychotic features, and generalized anxiety disorder." (*Id.*) At step three, he found these impairments did not meet or equal one of the impairments listed in Appendix 1 of the regulations. (*Id.* at 20–22.)

Next, in analysis germane to steps four and five, the ALJ found that Nunez had the residual functional capacity ("RFC") "to perform a substantial range of medium work . . . limited to simple, routine work with occasional contact with the public, and to work with no requirement to make discretionary job-related decisions, to engage in job-related conflict situations, or to be subject to assembly-line production rate quotas." (*Id.* at 22.) In making this finding, the ALJ explicitly relied on the ME's opinions, to which he accorded "great weight." (*Id.* at 30.) He

explained that the ME had "reviewed all of the evidence in the record" and that her opinions were "consistent with and supported by" that evidence "as a whole." (*Id.* at 30.) By contrast, the ALJ assigned only "limited weight" to the opinions of Arocho and Silva, and he did not say what weight, if any, he gave the evidence from Dr. Tandon. (*Id.* at 30–31.)

At step four, taking into account Nunez's age, education, and functional capacity, the ALJ determined she was capable of performing her past work. (*Id.* at 31.) Accordingly, the ALJ determined that Nunez was not disabled within the meaning of the SSA from December 24, 2011, to September 30, 2015. (*Id.* at 32.)

On June 13, 2016, over two weeks after the hearing, Dr. Gondolo wrote a letter stating, in sum total, "Mrs. Nunez has been seen in this office for neurological evaluation and follow ups. The patient has been diagnosed with major depression and tension headache. Due to [her] medical condition she is permanently and totally disabled." (Gondolo Letter, Ex. to Compl. (Doc. No. 1) at 7.) A copy of this letter is attached to the complaint in the instant action; it is not, however, in the administrative record.

On June 29, 2016, Nunez, still represented by Strauss, appealed the ALJ's ruling to the Social Security Appeals Council. (*Id.* at 251–54.) In a letter brief to the Appeals Council, Strauss enclosed a copy of Dr. Gondolo's letter. (*Id.* at 253.) On March 6, 2017, the Appeals Council denied review, rendering the ALJ's ruling the final determination of the Commissioner. (*Id.* at 1–6.) According to the Notice of Appeals Council Review, the Appeals Council received and reviewed the administrative record and Strauss's letter, but not Dr. Gondolo's letter. (*Id.* at 1–4.) Proceeding *pro se*, Nunez subsequently appealed to this Court. (Compl. (Doc. No. 1.).)

## STANDARD OF REVIEW

A final determination of the Commissioner of Social Security upon an application for SSI benefits is subject to judicial review as provided in 42 U.S.C. § 405(g).  *See* 42 U.S.C. § 1383(c)(3).  A court's review under 42 U.S.C. § 405(g) of a final decision by the Commissioner is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard.  *Lamay v. Comm'r of Soc. Sec.*, 562 F.3d 503, 507 (2d Cir. 2009); *see also Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  The district court has the "power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

"Substantial evidence" means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).  "In determining whether substantial evidence supports a finding of the [Commissioner], the court must not look at the supporting evidence in isolation, but must view it in light of the other evidence in the record that might detract from such a finding, including any contradictory evidence and evidence from which conflicting inferences may be drawn."  *Rivera v. Sullivan*, 771 F. Supp. 1339, 1351 (S.D.N.Y. 1991).  The "substantial evidence" test applies only to the Commissioner's factual determinations.  Similar deference is not accorded to the Commissioner's legal conclusions or to the agency's compliance with applicable procedures mandated by statute or regulation.  *See Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

"Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability

creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles." *Johnson*, 817 F.2d at 986. "However, where application of the correct legal principles to the record could lead only to the same conclusion reached by the Commissioner, there is no need to remand for agency reconsideration." *Calix v. Colvin*, No. 13-CV-4867 (SLT), 2016 WL 3003215, at *14 (E.D.N.Y. May 23, 2016) (citing *Zabala v. Astrue*, 595 F.3d 402, 409 (2d Cir. 2010)).

## DISCUSSION

"Even when a claimant is represented by counsel, it is the well-established rule in our circuit 'that the social security ALJ, unlike a judge in a trial, must on behalf of all claimants . . . affirmatively develop the record in light of the essentially non-adversarial nature of a benefits proceeding.'" *Moran v. Astrue*, 569 F.3d 108, 112–13 (2d Cir. 2009) (quoting *Lamay*, 562 F.3d at 508–09) (citing *Butts v. Barnhart*, 388 F.3d 377, 386 (2d Cir. 2004); *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996); *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)). "Social Security disability determinations are 'investigatory, or inquisitorial, rather than adversarial.'" *Id.* (quoting *Butts*, 388 F.3d at 386). "[I]t is the ALJ's duty to investigate and develop the facts and develop the arguments both for and against the granting of benefits." *Butts*, 388 F.3d at 386 (citation omitted).

Pursuant to this duty, ALJs are bound to "make every reasonable effort" to help claimants obtain evidence from their treating physicians and other medical providers and to "develop [the claimant's] complete medical history for at least the 12 months preceding the month in which [the claimant applied for benefits] unless there is a reason to believe that development of an earlier period is necessary." 20 C.F.R. § 404.1512(b)(1); *accord* 42 U.S.C. § 423(d)(5)(B) (requiring the Commissioner to "make every reasonable effort to obtain from the individual's

treating physician (or other treating health care provider) all medical evidence, including diagnostic tests"); *Ericksson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82–83 (2d Cir. 2009). As defined in the regulations, "every reasonable effort," entails making an initial request and at least one follow-up request to providers. 20 C.F.R. § 404.1512(b)(1)(i).

The ALJ's duty to develop the record may persist even after he has requested and received records as required in the regulations. If documents received from treating sources are unclear or inconsistent, the ALJ may be obligated to follow up by requesting "supporting documentation or [obtaining] additional explanations." *Nusraty v. Colvin*, 213 F. Supp. 3d 425, 442 (E.D.N.Y. 2016); *cf. Clark v. Comm'r of Soc. Sec.*, 143 F.3d 115, 118 (2d Cir. 1998) (holding there was "a serious question" as to whether the ALJ satisfied his duty after failing to seek clarification or follow-up from a treating physician regarding inconsistencies in his reports). If the ALJ fails to follow up and subsequently rejects the treating source's opinion, remand is appropriate. *See Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) ("[A]n ALJ cannot reject a treating physician's diagnosis without first attempting to fill any clear gaps in the administrative record.").

In this case, the ALJ failed to adequately develop the record in spite of its significant, obvious deficiencies and, as a result, he rendered a decision which the Court cannot say was supported by substantial evidence. First, the ALJ, and indeed every other SSA decisionmaker involved in this case, failed to recognize the significance of Dr. Gondolo's records and opinions and pursue them accordingly. At the initial stage, the field office was in possession of Dr. Gondolo's name and several documents – namely, the Function Report and Plaza Del Sol notes – indicating that Nunez had received neurology treatment at Elmhurst Hospital or in the Elmhurst neighborhood of Queens sometime in 2012. (*Id.* at 189, 284.) Nevertheless, the office

erroneously sought records from Elmhurst Hospital for only 2013 and 2014, and it made a single request to Dr. Gondolo at an unknown address. (*Id.* at 65–73, 202.) When it received nothing from either Elmhurst Hospital or Dr. Gondolo, the examiner denied Nunez's claims, incorrectly concluding there was no other medical opinion evidence to obtain. (*Id.* at 70.)

Next, at the ALJ stage, Nunez specifically identified Dr. Gondolo as the neurologist (not coincidentally located in Elmhurst, Queens) who had been treating her migraines since 2012. (*Id.* at 207.) The ALJ did not, however, attempt to make a follow-up request for the doctor's records, as required by the regulations. *See* 20 C.F.R. § 404.1512(b)(1)(i). Instead, he proceeded to the hearing, at which confusion ensued over which documents had been produced and whether they were sufficient to reach a decision, and at which he accepted without question the ME's impossible claim that her own diagnosis was supported by that of Nunez's "current neurologist." (*Id.* at 58.)

Finally, at the Appeals Council stage, Nunez's letter brief referenced and attached a letter in which Dr. Gondolo opined Nunez was "permanently and totally disabled." (Gondolo Letter at 7.) Somehow, though, the Appeals Council evidently never received the attachment. (Admin. R. at 1–4.) In the end, it, like every decisionmaker before, sanctioned a determination about the functional impact of a chronic migraine condition without obtaining a single record from the doctor who had treated that condition for at least the past three years. To say the least, from top to bottom, the Court cannot conclude the SSA made "every reasonable effort" to develop the record here. *See* 42 U.S.C. § 423(d)(5)(B) *Ericksson*, 557 F.3d at 82–83; 20 C.F.R. § 404.1512(b)(1).

The ALJ also did not obtain complete treatment records from WQCC – Nunez's only other relevant treating provider – and what records he did obtain may have been partially

illegible. WQCC records appear in two productions. The first production, which was received

by the field office, covered the brief period from the summer of 2013 (when Nunez started

seeking treatment there) to the beginning of 2014. (Admin. R. at 352–68.) It included an initial

treatment plan, notes from an early appointment with Dr. Tandon, and the results of several

assessments conducted by Silva. (*Id.*) It did not, however, include any therapy appointment

notes from Silva or any subsequent treatment notes from Dr. Tandon. The second production,

which was received on the eve of the hearing and hastily reviewed by the ME sometime during

the hearing, covered the much longer period from the beginning of 2014 through the date of the

hearing in 2016. (*Id.* at 444–80.) Although Nunez had reportedly continued to attend therapy

and see Dr. Tandon on a regular basis during this time, that production, like the previous one, did

not include any appointment notes. (*Id.*) Instead, it included a letter from Nunez's new

therapist, Arocho, and four documents which are partially illegible. If these documents were

legible to the ALJ and the testifying experts, it is not apparent from the record before the Court.

By not following up with WQCC to seek better and more complete records and an

opinion from Dr. Tandon, the ALJ again disregarded his duty to develop the record. (*See id.* at

123–33.) Dr. Tandon was Nunez's longtime treating psychiatrist and, given the complete

absence of evidence from Dr. Gondolo, the only relevant treating physician in the record.

Despite this, the ALJ did nothing to fill in the gaps in her records or seek a formal opinion from

her. *See, e.g.*, *Kessler v. Colvin*, No. 14-CV-8201 (JPO), 2015 WL 6473011, at *5 (S.D.N.Y.

Oct. 27, 2015) ("The duty to develop the record requires ALJs to 'seek additional information

from [the treating physician] *sua sponte*' where clinical findings are inadequate or unexplained."

(quoting *Schaal v. Apfel*, 134 F.3d 496, 505 (2d Cir. 1998))). Instead, the ALJ received

WQCC's final, incomplete production on the eve of the hearing; failed to turn it over to the

testifying experts until the hearing was already underway; relied on the ME's assurances that that production was sufficient; and subsequently issued a decision in which he did not assign any weight – significant or otherwise – to Dr. Tandon's views. This is plainly inadequate. *See, e.g.*, *Rosa*, 168 F.3d at 79.

In view of the ALJ's and the agency's failure to develop the record and its obvious impact on the ALJ's decision, the Court cannot conclude one way or the other whether the ALJ's decision was supported by substantial evidence. *See Rivera v. Barnhart*, 379 F. Supp. 2d 599, 604 (S.D.N.Y. 2005) ("In considering whether the decision of the SSA was supported by substantial evidence, the reviewing court looks to whether the ALJ complied with his affirmative duty to fully develop the record." (citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996))). What limited neurological evidence there is in the case record indicates that Nunez suffered from a combination of anxiety, depression with psychotic features, and cerebellar tonsillar ectopia, a condition which can cause severe migraines. For a period of at least four years, she sought and consistently received treatment for these conditions from a diverse group of mental health professionals. A small handful of these professionals' opinions appear in the record, and they uniformly evince something less than an optimistic view of Nunez's functional abilities, stating that she was "serious[ly] impair[ed] in social [or] occupational . . . functioning," (Admin. R. at 362, 364, 438), and showing "uneven progress" in developing a "capacity for everyday functioning," (*id.* at 443). The remainder of the relevant records and opinions, including those of the two physicians who had together treated nearly all of Nunez's relevant conditions from 2012 through the date of the hearing, were never sought or obtained. What these things would have said is not for the Court to guess. Without them, though, it cannot be said that the ALJ's opinion

is adequately supported.  Accordingly, this case is remanded to the Commissioner for further development of the record.

## CONCLUSION

For the reasons set forth herein, the Commissioner's motion for judgment on the pleadings (Doc. No. 16) is denied and the matter is remanded to the Commissioner for further proceedings consistent with this Order.  The Clerk of Court is respectfully directed to enter judgment accordingly, to mail a copy of this Order and the judgment to Nunez at the address listed on the docket, to note the mailing on the docket, and to close the case.

SO ORDERED.

Dated: Brooklyn, New York
      September 30, 2019

*Roslynn R. Mauskopf*
_____
ROSLYNN R. MAUSKOPF
United States District Judge